Filed 5/12/25  P. v. Grande CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GUDELIO GUTIERREZ GRANDE,<br><br>Defendant and Appellant. | F087832<br><br>(Super. Ct. No. BF177639A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Charles M. Bonneau, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Erin Doering, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant Gudelio Gutierrez Grande challenges his conviction for two counts of first degree murder with a special circumstance resulting in two consecutive sentences of

life without possibility of parole.  He argues the trial court improperly instructed the jury on aider and abettor liability and conspiracy to commit murder, that there is insufficient evidence to support the finding he personally discharged a firearm, that the People presented argument which shifted the burden of proof onto him, and that it was error for the jury to return two multiple-murder special circumstance findings.  We will strike one of the multiple-murder special circumstance findings but will otherwise affirm the judgment.

## PROCEDURAL HISTORY

On August 11, 2021, the Kern County District Attorney's office filed an information charging Grande with two counts of first degree murder for the murders of Marbeli Garcia and Emilio Diaz Chavez (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (a)).  As to both counts, it was further alleged Grande personally and intentionally discharged a firearm in the commission of the murder in violation of § 12022.53, subdivision (d), and that he committed multiple murders within the meaning of section 190.2, subdivision (a)(3).

On October 26, 2023, a jury found Grande guilty of both counts of murder in the first degree, and as to each count, found true he committed multiple murders and personally and intentionally discharged a firearm during the commission of the murders.  On March 19, 2024, the trial court sentenced Grande to two consecutive terms of life without the possibility of parole for the murders and consecutive sentences of 25 years to life for each of the section 12022.53, subdivision (d) enhancements.

## STATEMENT OF FACTS

Marbeli Garcia worked at a packing company with L.R.C.  In July of 2019, Garcia called L.R.C. crying.  Garcia told her that she and Grande, her boyfriend, had gotten into a fight and she asked L.R.C. to pick her up as she did not want to go back to him.

---

[1] Undesignated statutory references are to the Penal Code.

When L.R.C. picked up Garcia, Garcia told her she had picked up Grande's phone and became upset when she saw another woman had called him. Garcia said this angered Grande and he "threw her and hit her." L.R.C. invited Garcia to stay with her for the night.

The following day, Friday, July 19, 2019,[2] L.R.C. invited Garcia to go dancing and Garcia agreed. L.R.C. bought Garcia new clothes, and took her, L.R.C.'s boyfriend, and the boyfriend's cousin, Emilio Diaz Chavez, to a nightclub. The group returned to a hotel early Saturday morning, then went out dancing again Saturday night. In the early hours of Sunday, July 21, the group returned to L.R.C.'s house in Bakersfield. Garcia accompanied L.R.C. because she was planning on staying with L.R.C. for about a week until Garcia's friend returned from Mexico. After helping L.R.C. move some furniture, Garcia and Chavez left to get some food. That was the last time L.R.C. saw either of them alive.

On July 21 at approximately 11 p.m., Kern County Sheriff Senior Deputy Cody Johnson was called to a homicide scene at Rexland Acres Park. During a walkthrough of the scene, Deputy Johnson located Garcia's body near a picnic table with a small fireplace. Northbound along a path leading away from Garcia, Deputy Johnson observed blood droplets, and Chavez's body. Garcia suffered gunshot wounds in the middle center-left side of her back and the top of her head. Chavez suffered a gunshot wound in the upper-right chest area, a grazing gunshot wound to his right cheek, and two bullet wounds in his head.

Deputy Johnson testified that when a semiautomatic handgun fires, the casing that housed the bullet ejects from the firearm. Conversely, a revolver would continue to house the spent shell casing within its cylinder and nothing would be ejected. Deputy

_____

[2] References to dates are to dates in 2019 unless otherwise stated.

3.

Johnson did not find any shell casings at the scene, which led him to believe that the firearm was not a semiautomatic weapon.

Mark Chambless was working for the Kern County Sheriff's Department at the time of the murder and was assigned as lead detective in the case. Detective Chambless was able to obtain surveillance footage from around the time of the murder from a nearby school. One video from a north-facing camera showed two subjects – one appearing on the path, and one coming from behind the trees, then a flash of light. Detective Chambless testified the flash was consistent with a muzzle flash and occurred at approximately 9:54 p.m. and 42 seconds on July 21.[3] The individuals appeared, and the muzzle flash occurred, approximately 20 to 30 feet from where officers later discovered Chavez's body.

A second, south to southwest facing camera showed a subject walking at around 9:53 p.m. and 20 seconds toward the direction of the picnic table where Garcia's body was found. At 9:53 p.m. and 40 seconds, an individual is seen running away from the picnic table area. At 9:54 p.m. and 20 seconds, a second individual is seen running from the same direction.

A third video showed a suspect entering the park, and then a victim being chased by a suspect. The video also showed E.H., a bystander who was yelling for help and asking people to call 911.[4]

On July 25, Grande voluntarily went to the Kern County Sheriff's office with his daughter and Garcia's aunt to ask about the investigation. Officer Daniel Perez asked him some questions about Garcia and Chavez, and Grande stated that he had spoken to Garcia, and that Chavez had proposed to Garcia and given her flowers, but she declined

---

[3] The video denoted time in military time; the exact frame was marked 21:54:42.

[4] Although E.H. gave two statements to the officers, he did not testify and his statements were not admitted into evidence.

his offer. Grande did not mention anything about Rexland Acres Park, where Garcia and Chavez were found murdered.

On July 26, Officer Perez received call detail records for Grande's cell phone. Grande confirmed in a later interview that he was the sole possessor of his phone and number. He had owned the phone for about a year. The records indicated that Grande's phone utilized a tower in the area of Rexland Acres Park at the time of the homicide. The phone then returned to Grande's apartment at about 10:30 p.m. on July 21 before heading to Lamont, where the phone utilized towers between 11:24 p.m. and 11:40 p.m.

Call detail records pertaining to Garcia's phone indicated it was in the location of Rexland Acres Park on July 21 when Garcia was murdered. The phone was taken from the park and utilized a tower near Grande's apartment at around 10:40 p.m. that night, and finally the phone utilized a tower in Lamont, California between 11:28 p.m. and 11:30 p.m.

Grande was arrested on August 1 at his apartment in Bakersfield. A search of the apartment revealed mail addressed to "Gudelio Gutierrez." Officers also searched the apartment of Grande's brother, located in Lamont, California.

Detective Chambless and Detective Perez interviewed Grande. When he was brought in, he was placed in an interview room and left alone while the detectives prepared some items. At the time, Grande was wearing a work shirt with two patches on his chest – one with a company name and logo, and one indicating a name. The name on the shirt was "Angel." While Grande was alone in the interview room, he ripped the company patch off of his shirt and dropped it in the trash wrapped in a tissue. He attempted to conceal his actions by coughing and turning away from the camera.

Grande denied multiple times being at Rexland Acres Park, even after confronted with the information that his phone utilized a tower at the park near the time of the murder. He told the officers they should "look into it more."

Detective Christopher Wong conducted a search of the locker belonging to "Angel" at the business named on Grande's recovered shirt patch. The locker contained a Rexio .38 Special revolver wrapped in a towel, and .38 special ammunition. There were also three pieces of mail inside the locker addressed to Grande's apartment in Bakersfield, with the recipients listed as either "Gudelio Gutierrez Grande" or "Angel Ponce Martinez."

DNA evidence found on the revolver indicated Grande was the most likely contributor of DNA found on the trigger but was excluded as a potential contributor of the DNA found on the handgrip. There were at least two different profiles of DNA on the trigger. A forensic analysis of the bullets found in Garcia's and Chavez's bodies confirmed the bullets came from the revolver found in Grande's locker.

At trial, Grande presented an expert who opined that Grande's prior injury – a bullet wound – is the type of injury to cause permanent mobility issues. Therefore, the expert concluded Grande could not have been one of the individuals running in the surveillance video. In rebuttal, the People called a detective who was involved in Grande's arrest. The detective stated that during the arrest, when ordered to get on the ground, Grande ran at "full sprint" across a parking lot, a distance of approximately 30 yards.

## DISCUSSION

### I. The Trial Court Did Not Err Instructing the Jury on Aider and Abettor and Conspiracy Liability and Not Sua Sponte Instructing on Third Party Culpability

Grande argues the trial court erroneously instructed the jury on aider and abettor liability, including an instruction on uncharged conspiracy, because Grande did not receive notice of the People's intention to utilize those theories at trial. He further argues the trial court erred when it did not sua sponte give an instruction on third party culpability. We find the trial court properly instructed the jury on aider and abettor

liability and uncharged conspiracy and did not err when it did not sua sponte instruct the jury on third party culpability.

**A. Background**

*Aider and Abettor Liability*

Throughout this case, the People's primary theory of liability was that Grande was the actual killer and personally used a firearm to shoot and kill Garcia and Chavez. The complaint filed August 5 charges Grande as the killer and alleges that he personally discharged a firearm in the commission of the crime. At the preliminary hearing held August 10, 2021, the People presented evidence indicating Grande was the killer, and argued,

> "With regard to identity, [Grande] had a motive, given that Marbeli Garcia was planning to leave him, that Marbeli Garcia had been out dancing with another man and was out apparently having dinner at a park with another man where they were found together. And the other man happens to be the same one who was shot and killed.
>
> That the firearm linked to the murders was found in the work locker of [Grande] with his DNA on it, and that when he was speaking with police, he tried to hide the fact of where he worked, indicating that he had a consciousness of guilt, knowing the police were on to him and knowing that they would find the murder weapon at his place of work.
>
> With those facts, I think it's substantial to show that [Grande] did commit both first-degree murders with special circumstances."

In their trial brief, the People did not request any instructions addressing aiding and abetting liability or conspiracy as a theory of the murders.

At trial, Grande's primary defense was that he was not at the park and could not have been one of the people depicted in the surveillance footage. In his opening

statement, he argued that his prior injuries would affect his mobility and would have prevented him from moving like the individuals in the surveillance footage.

In closing arguments, the People argued,

> "Let's say – suspend disbelief for just a moment and say that was another person on the video. That means [Grande] got someone else to do it. That's all that means, because he was there and he had the murder weapon and those were targeted killings. Now, is that really true? No. That's not the case here. He personally killed them both. My point is if what the Defense says is true and that wasn't him on the video, he's guilty of first-degree murder on both Counts 1 and 2 anyway because he's either aiding and abetting or he's part of a conspiracy to commit murder."

Grande objected to CALCRIM numbers 400 and 401, the aiding and abetting instructions, and CALCRIM number 416, the uncharged conspiracy instruction. The trial court overruled the objections, finding the evidence supported giving those instructions, and invited the People to respond.

The People stated,

> "With regard to substantial evidence, the People do not believe that aiding and abetting or conspiracy are valid theories, per se, because the People do not believe that the Defense's evidence should be believed, i.e. that [Grande] was not the person on the video. However, because evidence was admitted to suggest that [Grande] was not the person on the video, the jury could very well decide that evidence was credible and decide [Grande] was not the person on the video. That begs the question, then, why was [Grande] at the location, why was he in possession of the murder weapon after the fact and why did he show a guilty conscience in a number of different ways? I think the most reasonable response to that is he either aided and abetted the murder or conspired to commit the murder with an unknown other, and that is the explanation for Defense's evidence rather than acquittal being the result."

*Third Party Culpability*

Grande argues the following facts support his theory that there was substantial evidence presented showing the participation of a third party in the shooting.

Grande's brother lives in Lamont and was present when the address was searched. Grande's phone records show his phone utilized a tower in Lamont on July 21 at 7:30 p.m., then traveled to Rexland Acres Park, utilizing a tower in the area around the time of the shooting. Two individuals were seen in the surveillance footage running from the area where Garcia's body was found, but the video does not show if either of the individuals was responsible for the muzzle flash. Grande's phone utilized a tower near his Bakersfield apartment, then later proceeded to utilize a tower in Lamont.[5] At least two people contributed to DNA found on the murder weapon, and while Grande was a highly likely contributor to the DNA found on the trigger guard, no DNA sample was taken from Grande's brother.

Grande did not request CALCRIM number 373, or any other third party culpability instruction at trial.

**B. Analysis**

*Aider and Abettor and Conspiracy Instructions*

" 'The Sixth Amendment guarantees a criminal defendant a fundamental right to be clearly informed of the nature and cause of the charges in order to permit adequate preparation of a defense. [Citations.] "A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense — a right to his day in court — are basic in our system of jurisprudence." ' " (*People v. Gallego* (1990) 52 Cal.3d 115, 189.)

---

[5] Grande argues that on July 21 his phone went from the crime scene to his apartment and stayed there. The testimony presented at trial indicates that his phone went from Lamont to the crime scene, to his apartment, before returning to Lamont.

"[T]he definition of a principal has historically included those who aid and abet (§ 971), and notice as a principal is sufficient to support a conviction as an aider or abettor." (*People v. Garrison* (1989) 47 Cal.3d 746, 776, fn. 12.) "In California one may be convicted of aiding and abetting without the accusatory pleading reciting the aiding and abetting theory so long as defendant is charged in that pleading as a principal to the substantive offense and thus receives notice of the charge against him." (*People v. Greenberg* (1980) 111 Cal.App.3d 181, 188.)

We review questions of constitutional law and mixed questions which are predominantly legal, de novo. (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 70 (*Quiroz*).)

It is well established "that under this state's statutory scheme, an accusatory pleading charging a defendant with murder need not specify the theory of murder on which the prosecution intends to rely." (*People v. Diaz* (1992) 3 Cal.4th 495, 557.) While there may be some situations in which the United States Constitution may require greater specificity, "generally the accused will receive adequate notice of the prosecution's theory of the case from the testimony presented at the preliminary hearing or at the indictment proceedings." (*Ibid.*)

"It is unsettled whether California's short-form pleading practice, without more, confers constitutionally adequate notice of the People's decision to proceed on an implicitly charged alternative legal theory." (*Quiroz, supra,* 215 Cal.App.4th at p. 70.) Nonetheless, courts have deemed "notice of a new theory to be constitutionally sufficient when the defendant is further alerted to the theory by the evidence presented at the preliminary hearing [citations], or by the People's express mention of that theory before or during trial sufficiently in advance of closing argument [citations]. What due process will not tolerate is the People affirmatively misleading or ambushing the defense with its theory." (*Id.* at pp. 70-71.)

10.

It is true that in this case, the People did not argue aiding or abetting, or uncharged conspiracy until closing argument. However, Grande was clearly alerted to the theory by the evidence presented at the preliminary hearing and trial. He argued he was not present at the scene and could not have been one of the people depicted on the surveillance video due to his prior injuries. This argument was presented for the first time in his opening statement, following the conclusion of the People's case in chief.

Grande's argument, in conjunction with the remaining body of inculpatory evidence, reflected his awareness of the fact that even were the jury to believe he was not physically present at the shooting, he could nonetheless be culpable pursuant to an alternate theory of liability such as aiding and abetting or conspiracy to commit murder.

Neither was the People's delay in asserting the aiding and abetting and conspiracy theories of murder liability "prosecutorial gamesmanship." (*Quiroz, supra,* 215 Cal.App.4th at p. 71.) The People consistently presented a single theory of liability throughout the case, starting at the preliminary hearing – that Grande was the actual killer and personally shot the victims. Nonetheless, the People told the trial court they felt compelled to request the instruction due to Grande's defense theory, although they maintained it was not a valid theory per se because Grande was the actual killer and personally shot the victims. The record does not reflect an intent by the People to "ambush" Grande, but rather to respond to the theory of the case he himself presented at trial.

Additionally, "in cases where a new theory is introduced late in the game for reasons other than prosecutorial gamesmanship, courts have employed a harmless error test. That test looks to whether the late notice 'unfairly prevented [defense counsel] from arguing his or her defense to the jury or ... substantially mislead [counsel] in formulating and presenting arguments.' " (*Quiroz, supra,* 215 Cal.App.4th at p. 71.)

Because we find no prosecutorial gamesmanship in the instant case, we look to whether error, if any, was harmless. Grande argues that had he been aware of the

11.

People's intent to introduce aider and abettor and conspiracy liability, he could have investigated the alternative defense of third party culpability more thoroughly or sought more comprehensive DNA testing.

However, the video evidence which showed two suspects running from the area where Garcia's body was found was introduced at the preliminary hearing. The DNA evidence, including that there were at least two, and potentially three, DNA profiles on the trigger guard of the murder weapon, was also introduced at the preliminary hearing.

Even prior to trial, Grande was aware that there was some evidence of multiple potential suspects and was likewise aware of his intent to argue he was not involved in the killing and not present at the park. He posits there is evidence his brother is culpable – this was also information known to him which he could have chosen to investigate further. Therefore, the People's late introduction of the alternate theories of murder liability did not "substantially mislead" Grande's counsel from formulating and presenting arguments about third party culpability. (*Quiroz, supra,* 215 Cal.App.4th at p. 71.) Grande had sufficient information at the preliminary hearing to investigate and potentially uncover the identities of the alleged third parties at the park or the sources of the other DNA profiles on the murder weapon. The trial court did not infringe upon his constitutional rights when it gave the CALCRIM numbers 400, 401, and 416 instructions, and error, if any, was harmless.

*Third Party Culpability Instructions*

" 'A criminal defendant may introduce evidence of third party culpability if such evidence raises a reasonable doubt as to his guilt, but the evidence must consist of direct or circumstantial evidence that links the third person to the crime. It is not enough that another person has the motive or opportunity to commit it.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824 (*Gutierrez*).)

"[A] trial court has a duty to instruct sua sponte 'on those general principles of law that are closely and openly connected with the facts before the court and necessary for the

12.

jury's understanding of the case.' " (*People v. Simon* (2016) 1 Cal.5th 98, 143.) " '[A] trial court has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions "as to defenses ' "that the defendant is relying on ..., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' " ' " (*Gutierrez, supra,* 45 Cal.4th at p. 824.)

However, the defendant bears the burden of requesting a pinpoint instruction. (*Gutierrez, supra,* 45 Cal.4th at p. 824.) " 'Such instructions relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." ' " (*Ibid.*) " '[S]uch a pinpoint instruction does not involve a "general principle of law" as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 669.)

Grande did not request a third party culpability instruction or argue third party culpability at trial. On that basis alone, we find the trial court did not err.

Grande argues that the evidence in this case is sufficient to link his brother as a third party culpable for the killings. He relies on *People v. McWhorter* (2009) 47 Cal.4th 318 and *People v. Hall* (1986) 41 Cal.3d 826 to support his proposition. However, in both cases, the defense affirmatively presented evidence of third party culpability which was denied by the trial court. In this case, Grande made no such request or showing.

Regardless, error, if any, was harmless. Grande argues the trial court should have sua sponte given CALCRIM number 373,[6] or a custom instruction he formulated which reads:

---

[6] CALCRIM number 373 reads "The evidence shows that (another person/other persons) may have been involved in the commission of the crime[s] charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about

13.

"The evidence shows that (another person/other persons) may have been involved in the commission of the crime[s] charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must consider whether the other person acted without the defendant's shared knowledge and intent. If the other person acted without the defendant's knowledge or intent, you must consider whether the defendant is not guilty of murder or whether he is guilty of a lesser offense."

"An instruction that does no more than affirm that the prosecution must prove a particular element of a charged offense beyond a reasonable doubt merely duplicates the standard instructions defining the charged offense and explaining the prosecution's burden to prove guilt beyond a reasonable doubt. Accordingly, a trial court is required to give a requested instruction relating the reasonable doubt standard of proof to a particular element of the crime charged only when the point of the instruction would not be readily apparent to the jury from the remaining instructions." (*People v. Bolden* (2002) 29 Cal.4th 515, 558-559.)

In this case, the jury received complete and accurate instructions on the People's burden of proof on the elements of murder, including the requirement that the People prove beyond a reasonable doubt that Grande committed the acts that caused the deaths of Garcia and Chavez.[7] Grande's proposed instruction merely explains the prosecution's burden to prove identity beyond a reasonable doubt, rendering error, if any, harmless.

---

whether (that other person has/those other persons have) been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crime[s] charged."

[7] Or aided and abetted the perpetrator or conspired with the perpetrator to commit the acts.

## II.  Substantial Evidence Supports the Finding Grande Personally Discharged the Firearm

Grande argues that his later possession of the revolver, and his DNA on the trigger guard, show only that he had possession of the revolver at some time, not necessarily at the time of the shooting.  He concludes there is insufficient evidence he personally discharged the firearm during the commission of the murders.  We find sufficient evidence supports the jury's findings that Grande personally discharged the firearm.

On appeal, the reviewing court " 'must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)  We "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

The record shows that Grande was in Rexland Acres Park at the time of the shooting.  His phone utilized a tower in the area of the park within minutes of the shooting, and he told detectives he was the only one who possessed and used his phone.  After the shooting, his and Garcia's phones followed the same path from Rexland Acres Park to his apartment, then to Lamont.  When he was arrested and interviewed, he tried to hide information pertaining to his place of employment when he ripped a patch with the name and logo of the company where he worked off of his shirt and put it in the trash.  He also attempted to conceal his actions, from which the jury could reasonably infer a consciousness of guilt.  In his work locker, officers found the murder weapon, and his DNA was on the trigger guard.

Grande also had a personal relationship with Garcia, who was his girlfriend.  Garcia had left him several days earlier due to his alleged abuse and perceived infidelity.  Garcia was at the park with Chavez, another man who Grande claimed had proposed to

Garcia. A jury could reasonably infer Grande acted out of jealousy and anger as motives to shoot Garcia and Chavez.

Taken together, there is evidence which is reasonable, credible, and of solid value such that a trier of fact could find Grande personally discharged the revolver, killing Garcia and Chavez. The section 12022.53, subdivision (d) enhancements are supported by substantial evidence.

### III. The People Did Not Improperly Shift the Burden Of Proof Onto Grande During Closing Argument

Grande contends, in closing argument, the People erroneously questioned his decision not to cross examine one of the witnesses on a factual issue Grande subsequently challenged in closing argument, shifting the burden of proof onto Grande and violating his due process rights. We find the trial court did not abuse its discretion in denying his claim of prosecutorial misconduct.

### A. Background

At trial, Kern County District Attorney Investigator Darren Wonderly testified regarding the cell phone data received during the investigation of this case. As part of his testimony, he presented a demonstrative slide show summarizing some of the relevant information for the jury. As to one slide, Investigator Wonderly testified,

> "Slide 10, again, on 7/21/2019, from 8:20 to 8:22 p.m., there were three different transactions recorded through the network. And those transactions used a tower here north of Lamont for the 8:20 p.m. data usage, and we know that by these little symbols on the side. The little circles will show a globe and that's going to be data usage. There's two globes and there's a symbol of a telephone. That will actually be a call. The other tower that was used for two of the transactions is…south of East Panama Lane, east of South Dr. Martin Luther King Junior Boulevard. That was one data usage, and then also that telephone call. I put an extra text box at the bottom of that to represent what that telephone call is."

The slide Investigator Wonderly referenced was designated slide number 10. The text box Investigator Wonderly referenced was titled "Call Details," and indicated a date of July 21 at 8:22 p.m. and 33 seconds, and a call type of "voice." The calling number was previously identified as Grande's number, and the number called was Garcia's. Grande did not cross examine Investigator Wonderly.

In closing argument, defense counsel stated,

> "I want to talk about something else. You remember Mr. Wonderly – Officer Wonderly… Very Agreeable expert, very knowledgeable. He did a slideshow. He showed this is where this phone number was at this certain time and the other. That slideshow, you're not going – it's not going to be in the evidence. Demonstrative evidence, but it's not in any of these disks. It's something he created. He created that after they had subpoenaed the phone records from a certain phone number and there's the raw data.
>
> I want to show you the raw data. Here's titled CDR People's Number 32, CDR, DCP4. If you want to look at it, this is where it's going to be. You open that up and you have this A19. Remember he talked about the CDR. Remember all the locations that he was able to locate because of the CDR, because of the raw data. This is what is in the evidence, one page. One page of data. There's also the NELOS that he talked about. He talked about the NELOS, about a – separate from the CDR. That was his second part of his testimony. And the NELOS record is much more extensive than a CDR. He went through these records and he made his testimony.
>
> [¶] … [¶]
>
> Now I want to draw your attention to what Mr. Wonderly testified to. This is an extraction that he said was from the CDR, but we know that the underlying CDR is only one page. I don't know how he got it. You don't have the information, but this is his testimony.

17.

I want to try to draw your attention to his testimony, if you remember it. I don't know if you took notes. I don't know if you can see it. I'm going to walk closer to it. This here is 9:26:39. It's a text message, 9:30:30. There's two things here. There's a missed call at 9:41. There's a phone call at 9:41. It's something early. I do recall that Officer Wonderly testified that there's like a long conversation, like a 14-minute talk that lasted long that was around this area.[8] What is that conversation? What is that evidence? We don't know, but there's a way to interpret it[.]

If the People are taking the position that this is [Grande's] telephone, that he's in contact with Ms. Garcia and you're convinced by that, you believe that they've proven that beyond a reasonable doubt. We know that before the homicide that occurred at 9:54:10 … immediately before that there was a conversation, and there are other conversations. I would say we don't know what transpired during that conversation, but we do know that the homicide occurred close in time to that conversation.

[¶] … [¶]

I submit to you that the phone records are incomplete. We don't know this belongs to the telephone of [Grande], that they're relying on hearsay evidence. They haven't proven that."

In response, the People argued in closing,

"We know that's the defendant's number because he said that was his number. We know that's the defendant's DNA because it's clearly the defendant's DNA. We know that's his locker because his stuff was in it. It was his name on the gun with his DNA, the gun that was used to kill his

---

[8] Grande appears to be referencing another page of Investigator Wonderly's PowerPoint presentation, slide 15. This page shows activity for Grande's phone number between 08:57:52 p.m. and 10:30:17 p.m. on July 21. This slide also has a call details text box, dated July 21 at 09:26:39 p.m., with a call type of "text." The calling number is Grande's number, and the number called was Garcia's. Additionally, the call detail records in the slide show two calls on July 21 at 9:41:01 p.m., one of which appears to be a missed call demarcated by a phone symbol and highlighted in red.

18.

girlfriend. All of these things come together and show you a picture of a murderer. You can't take one at a time and say if we make believe and if we pretend this is really something that it isn't, then there's doubt[.]

[Trial counsel] does not have a burden of proof, yet he stood up here and he said that Investigator Wonderly's presentation doesn't make any sense because there's not enough evidence on the exhibit. That's kind of odd because, if I remember correctly, Investigator Wonderly is sitting right here and the presentation was right over there. And when I got done asking questions, [the trial court] looked over at [trial counsel] and asked if he had any questions. Now if the exhibit didn't support what Investigator Wonderly was saying, well, then, there's some pretty big questions to ask, aren't there?"

Grande objected to improper burden shifting, and the trial court held a side bar. Upon resuming proceedings on the record, the court denied the objection, and reminded the jurors that the only burden of proof to prove anything is on the People, to prove guilt beyond a reasonable doubt. The court commented, "[t]he Defense has no burden to … prove that [Grande's] innocent, for example. The burden of proof is solely on the People."

The People continued,

"In Investigator Wonderly's presentation if there was some problem with the evidence, if the evidence didn't support what he was saying, wouldn't that be the time to bring it up? Because if it had been brought up, then I would have the chance to ask him more questions. Well, we've seen there's only one page here. What does that mean? If you don't ask any questions and you just wait until the end of the trial and now Investigator Wonderly is not on the stand, I can't ask these questions and we don't get to hear from him. Come on. If that exhibit didn't actually support what Investigator Wonderly had done, it would have been pointed out immediately.

[Trial counsel] is a skilled examiner … The questions that he's asking, they're pointed. No questions for

19.

Investigator Wonderly.  That is [Grande's] cell phone number because that's what the evidence says."

Subsequently, Grande renewed his burden shifting objection.  The trial court stated, "I'm confirming my ruling.  Although I will point out that after we had our sidebar with regard to your objection about burden shifting, I once again admonished the jury that you have no burden to prove anything or to produce evidence.  You don't have to prove your client is innocent, that the only burden is on the People.  But I'm familiar with case law that relates to what's proper during closing argument, and the case law is pretty clear that an attorney is permitted to comment on the other attorneys' failure to produce evidence that was available to them, and I think that's consistent with what [the People were] doing.  If there's evidence that's available to you and you chose not to produce it, then [the People] can make comment on that.  That's my ruling."

On February 13, 2024, Grande filed a motion for a new trial on the basis that the People's closing argument improperly shifted the burden of proof onto him.  The motion was heard on March 19, 2024.  The trial court ruled, "[h]aving considered the arguments, the points and authorities – the Court itself heard the closing arguments and the evidence in the case – I do not find that the prosecutor engaged in prosecutorial misconduct under all the circumstances.  Even assuming, for the sake of argument, that he did, I do not find that it is reasonably probable that a result more favorable to [Grande] would have occurred had the district attorney refrained from the comments he made during closing argument.  Again, [the People do] correctly highlight some of the very strong evidence, which is pretty compelling, supporting the guilty verdict in this case."

**B.  Analysis**

"As a general principle, prosecutors may allude to the defense's failure to present exculpatory evidence.  For example, the prosecutor may comment on the defense's failure to call logical witnesses or introduce material evidence.  [Citation.] …  A prosecutor may call attention to the defense's failure to put on exculpatory evidence, but

only if those comments are not aimed at the defendant's failure to testify and are not of such a character that the jury would naturally and necessarily interpret them to be a comment on the failure to testify." (*People v. Guzman* (2000) 80 Cal.App.4th 1282, 1289 (*Guzman*).) "[A] prosecutor is free to give his opinion on the state of the evidence, and in arguing his case to the jury, has wide latitude to comment on both its quality and the credibility of witnesses." (*People v. Padilla* (1995) 11 Cal.4th 891, 945, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800.)

" 'A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects " 'the trial with unfairness as to make the resulting conviction a denial of due process.' [Citation.]" [Citation.] The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor. [Citation.] Conduct that does not render a trial fundamentally unfair is error under state law only when it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 920 (*Hamilton*).)

" 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1337 (*Seumanu*).)

We review the trial court's rulings on prosecutorial misconduct for abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 792-793.)

Grande argues the prosecutor's statement that the data supporting Investigator Wonderly's demonstrative slideshow must exist, was improper and shifted the burden of proof in violation of due process. We do not find the People's argument to be burden shifting. The People argued that Grande had failed to utilize his opportunity to cross-

21.

examine Investigator Wonderly to determine the exact basis for the information in the demonstrative exhibit.  The People concluded that the cell phone number referenced in the call records was Grande's "because that's what the evidence says."  This argument was in response to defense counsel arguing in closing that "the phone records are incomplete" and "[w]e don't know this belongs to the telephone of [Grande.]"

The People were commenting on Grande's "failure to introduce material evidence," something the People are permitted to do in closing argument.  (*Guzman, supra,* 80 Cal.App.4th at p. 1289.)  And multiple times throughout the argument, the jury was nonetheless admonished that Grande did not have a burden of proof, and the People bore the entire burden to prove every element of the charged offenses beyond a reasonable doubt.

Nor did the trial court abuse its discretion in finding no prosecutorial misconduct. The People's argument was not "the use of deceptive or reprehensible methods" to persuade and did not "infect" the trial with unfairness.  (*Hamilton, supra,* 45 Cal.4th at p. 920.)  The People's brief comments pointed out Grande's decision not to cross examine Investigator Wonderly in response to Grande's own closing argument calling into question Investigator Wonderly's testimony.

And even if the People's comments during closing arguments amounted to prosecutorial misconduct, the trial court did not abuse its discretion finding error, if any, was harmless.  Grande has not shown there is a reasonable probability the jury applied the complained-of comments in an inappropriate manner.  (*Seumanu, supra,* 61 Cal.4th at p. 1337.)  As the trial court noted, there was strong, compelling evidence supporting the verdict in this case.

**IV.    One of the Two Multiple-Murder Special Circumstances Must Be Stricken**

Grande argues only one multiple-murder special circumstance is authorized, and the duplicate finding must be stricken.  The Attorney General agrees.

Grande is correct.  "[W]hen a defendant kills two persons the People should allege only one multiple-murder special circumstance; the use of two such special circumstance allegations artificially inflates the seriousness of the defendant's conduct."  (*People v. Jones* (1991) 53 Cal.3d 1115, 1148.)   In these circumstances, the appropriate remedy is for the court to strike the superfluous finding, and conclude the defendant suffered no prejudice.  (*People v. Halvorsen* (2007) 42 Cal.4th 379, 422.)  The Attorney General is also correct in pointing out that the special circumstance findings are not included in the abstract of judgment.  Therefore, remand in this case is unnecessary.  Accordingly, we strike the second multiple-murder special circumstance finding and otherwise affirm the judgment.

### DISPOSITION

The second multiple-murder special-circumstance finding is stricken.  In all other respects, the judgment is affirmed.


FAIN, J.*

WE CONCUR:


HILL, P. J.


LEVY, J.

_____

*Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23.